## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 16 2017, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

J. Clayton Miller
Jordan Law, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Marilyn M. Clontz, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 16, 2017 <br><br> Court of Appeals Case No. <br> 21A01-1609-CR-2125 <br><br> Appeal from the Fayette Circuit Court <br><br> The Honorable Beth Ann Butsch, Judge <br><br> Trial Court Cause No. <br> 21C01-1410-FC-770 |

**Najam, Judge.**

# Statement of the Case

Marilyn M. Clontz appeals the trial court's restitution order, following a sentencing hearing. She raises the following issues on appeal:

1. Whether the trial court abused its discretion when it ordered her to pay restitution in the amount of $641,147.93.

2. Whether the trial court abused its discretion when it ordered her to pay restitution in the monthly amount of $250 during her probation period.

We affirm in part, reverse in part, and remand with instructions.

# Facts and Procedural History

In June 2008, Thomas Mertens, owner of Indiana Ordnance, Inc. ("IOI"),[1] hired Clontz as IOI's business manager and thereafter was not himself involved with the daily management of the company. Mertens and his daughter, Darlene Mihaly, (collectively, "the IOI owners") served as members of the board of directors of IOI. Clontz also served as a member of the board of directors of IOI and as IOI's secretary and treasurer. Clontz was a signer on some of IOI's bank accounts and was authorized to, and did, write checks and make payments for the company. Clontz's husband, Robert Clontz ("Robert"), was employed as IOI's "gunner." State's Ex. 2.

---

[1] The record does not disclose what type of business IOI was, other than that it had contracts with the federal government that likely related to munitions.

[4] In December 2010, in addition to working for IOI, Clontz and her husband started their own company called Dynamic Munitions ("DM"), which was a business similar to IOI. DM became active in August 2011 but ceased operations in January 2013.

[5] In December 2012, the IOI owners discovered that there was money missing from one of IOI's bank accounts and that Clontz had opened two unauthorized back accounts in IOI's name, with Clontz as the primary signer on the accounts. The IOI owners also discovered an unauthorized outstanding bank loan in the amount of $160,000, and they then learned for the first time that IOI had failed to pay county, state, federal taxes.[2] They filed a police report with the Connersville Police Department, who referred the investigation to the organized crime and corruption unit of the Indiana State Police. Detective Amy Johnson investigated IOI's complaint.

[6] Clontz ceased working for IOI in December 2012, at which point Mihaly "took over everything having to do with money in the business." State's Ex. 2. However, IOI rehired Clontz as a consultant in March 2013 and made her and her husband "solely responsible for running IOI until August-September 2013." *Id*. Clontz and Robert quit their employment at IOI in September 2013.

[7] On October 24, 2014, Detective Johnson filed a seven-page probable cause affidavit for an arrest warrant for Clontz. The affidavit provided details of

---

[2] The record does not disclose the years for which taxes were not paid.

Detective Johnson's almost two-year-long investigation of the IOI owners'
allegations.  Specifically, the affidavit stated, in relevant part, as follows:

> On January 18, 2013, I met with Connersville PD Detective
> Carol McQueen about a theft case that was reported to her
> around December 17, 2012.  Det. McQueen stated Thomas
> Mertens[,] owner of Indiana Ordnance, Inc. (IOI), 901 W. 21st
> St. Connersville, In 47331, reported allegations of theft and fraud
> by former employees Marilyn and Robert Clontz.
>
> * * *
>
> Det. McQueen stated Mr. Mertens and his daughter Darlene,
> who both live in Ohio, were in town to conduct business
> involving IOI when Mr. Mertens discovered IOI's line of credit
> at Union Savings and Loan had a balance of about $37,000.  The
> balance had been $150,000 [and] Mr. Mertens was not aware that
> the line of credit had been used.  [The IOI owners] also
> discovered an unauthorized checking account with a debit card at
> Union Savings [that] they were unaware of and the account was
> in the Clontz's name[s] with IOI.  Mr. Mertens also found a
> second unauthorized account located at First Financial Bank,
> [but] only one account at First Financial had been approved by
> the board.  Det. McQueen stated [that] on December 19, 2012,
> Darlene and Mr. Mertens went to the [IOI] office and found
> Marilyn[] Clontz had cleaned out her desk and the information
> on the computers had been deleted.  Det. McQueen stated the
> business was in the process of being sold to Ryan Wilhelm.
>
> * * *
>
> On February 4, 2013, I spoke on the telephone with Ryan
> Wilhelm[.]  [H]e was purchasing the business from Thomas
> Mertens, and discovered the missing money from Indiana

Ordnance. Mr. Wilhelm stated Mr. Mertens inherited the business from his brother in 2006, and Tom Mertens had been an absent owner. Mr. Wilhelm stated [that] Mr. Mertens trusted Marilyn and Robert Clontz to run and operate the business for him. Mr. Wilhelm stated he went through the financials of the business and found what he believed [to be] suspicious transactions and reported it [sic] to Mr. Mertens.

* * *

On February 27, 2013, I spoke on the telephone with Darlene Mihaly . . . [who] stated [that] Marilyn Clontz [had] failed to pa[y] the taxes to the IRS [and had] failed to pay payroll taxes, [that] there were missing royalty checks, and [that] the weekly financial statements Marilyn Clontz sent her did not match up to the bank statements.

Through further investigation, the weekly reports that were prepared and submitted by Marilyn Clontz to Darlene Mihaly for review contain[ed] fraudulent information.[3] The weekly reports always showed less money in the primary business account because Marilyn Clontz was using the unauthorized second account #3207 [that] the owners didn't know about for unauthorized deposits and unauthorized checks[.]

Appellant's App., Confidential Vol. II, at 12.

[8] The probable cause affidavit then noted that Detective Johnson had subpoenaed and obtained bank records of IOI's bank accounts and listed "approximately 95 unauthorized transactions from 2010 through 2012 totaling

---

[3] The weekly financial statements prepared by Clontz are not in the record.

$170,407.98" from two First Financial IOI bank accounts. *Id*. She also listed "approximately 53 unauthorized transactions from 2010 through 2012 totaling $150,739.75 from the Union [Savings and Loan] account." *Id*.

[9] On October 24, the State charged Clontz with corrupt business influence as a Class C felony, fraud on a financial institution as a Class C felony, and theft as a Class C felony. Clontz ultimately pleaded guilty to corrupt business influence as a Class C felony, and the State dismissed the remaining charges. Pursuant to the plea agreement, Clontz was sentenced to eight years fully suspended to probation and the amount of restitution was to be determined by the court.

[10] On August 15, 2016, the trial court conducted an evidentiary hearing to determine the restitution amount. Detective Johnson provided testimony explaining State's Exhibit 1,[4] which was her supplemental report containing the same bank account information regarding unauthorized transactions that she had provided in her probable cause affidavit. Specifically, each of the listed ninety-five allegedly unauthorized transactions from First Financial, totaling $170,407.98, included: (1) a date; (2) the last four digits of the account number from which funds were withdrawn; (3) the last four digits of the account number into which funds were deposited, if applicable; (4) a check number, if applicable; (5) the name of the person(s) or entity to which the funds were made payable; and (6) the amount of funds. *Id*. Some of those transactions showed

---

[4] Clontz did not object to the admission of State's Exhibit 1.

that funds had been withdrawn from an IOI account and either paid to Clontz or one of her family members or deposited into Clontz's or a family members' personal bank accounts. Other transactions showed that funds had been withdrawn from an IOI account and deposited into the bank account for the Clontz's company, DM. There were three large transactions that provided only the date, the name "Indiana Ordnance," and the dollar amount. *Id.*

[11] Each of the fifty-three allegedly unauthorized transactions from Union Savings and Loan Association that were listed in State's Exhibit 1, totaling $150,739.75, included: (1) a date; (2) the type of transaction, if applicable; (3) the location of the transaction, if applicable; (4) the person or entity to which payment was made, if applicable; and (5) the amount of funds. The transaction types included ATM withdrawals, telephone payments, checks to persons or entities, online payments, and automatic payments. *Id.*

[12] Detective Johnson testified that each of the transactions listed in State's Exhibit 1 were transactions she had reviewed from bank records and which she felt "raised a flag" or appeared to be in the wrong account. Tr. at 22. Detective Johnson stated that she did not go over each one of these transactions with any other person like the IOI owners or employees. Rather, she "just went through [each transaction] and tried to see what was reasonable." *Id.* Detective Johnson testified that she requested receipts from IOI related to the unauthorized transactions but that IOI had no such receipts. Detective Johnson stated that the "owner of Indiana Ordnance" said "some of the deposits" shown in Exhibit 1 were not authorized and that they were not aware of "some of the

accounts." *Id*. at 23-24. Detective Johnson testified that some funds went from IOI bank accounts into DM accounts and some funds went from DM accounts into IOI accounts. However, Detective Johnson did not determine the exact amounts transferred between those two businesses' accounts.

[13] Clontz introduced into evidence her exhibits A through D, which summarized the explanations contained in her previously filed Proposal for Restitution. Appellant's App. Vol. 2, confidential, p. 125 – Vol. 3, p. 193. Clontz testified that her Exhibit A summarized each transaction in which she had incorrectly used IOI funds totaling $10,796.49 for personal matters. She testified that her Exhibit B summarized two transactions for which she could not find any records in the documents the State provided her in discovery, including bank statements. Thus, Clontz stated she could not reach any conclusions about those transactions, which totaled $11,984.50. She testified that her Exhibit C summarized each transaction for which she had records showing it was authorized; that is, she had a "paper trail" from the documents provided by the State, which showed that these transactions were legitimately made for IOI. These transactions totaled $226,749.24, and the copies of supporting documents for each transaction was located in Clontz's Proposal for Restitution. *Id*. Finally, Clontz testified that her Exhibit D summarized the transactions she was unable to reconcile because IOI did not provide her with records she had subpoenaed that would have explained each of the transactions. Those transactions totaled $70,917.50.

[14]     The State introduced into evidence its Exhibit 2, the "Victim Impact Statement and Restitution Information" and an accompanying letter, both of which were completed by Mihaly and submitted by her to Fayette County Victim's Assistance in November 2014. The vicitim's impact statement stated IOI had the following losses due to Clontz's offense: "at least $100,000" worth of stolen property; $100,000 in lost work; $100,000 in "Legal/CPA Fees [and] IRS back taxes[;]" and a $300,000 loss "due to embezzlement." State's Ex. 2. Clontz objected to the admission of State's Exhibit 2 because Clontz did "not agree with the figures" regarding restitution that were contained in the exhibit. Tr. at 43. However, the trial court admitted that exhibit over Clontz's objection.

[15]     Mihaly did not testify at the August 15 restitution hearing, but Mertens did. Mertens stated he was aware of and authorized Mihaly's letter that was attached to the victim impact statement in Exhibit 2. However, Mertens did not know what property had allegedly been stolen from IOI by Clontz or how IOI lost work due to Clontz's actions. Mertens said IOI lost at least one government contract as a result of Clontz's actions, but he did not know the value of the lost contract. He testified that there were "some maybe" taxes not paid by the company due to "the thefts" but he did not know how many. *Id.* at 33. Mertens testified that IOI had hired two Certified Public Accountants ("CPAs") to address the issue of the unpaid taxes, but he did not know how much, in total, IOI had paid the CPAs in fees. He only knew that one CPA charged $100 per hour and the other charged a flat fee of $1500. Mertens also testified that IOI paid out $320,000 in 2012 for a lawsuit unrelated to Clontz

and that the lawsuit payment "could have been" one of the reasons IOI got behind in paying its taxes. *Id.* at 36.

[16]     Mertens testified that, around December 2012, the IOI owners planned to sell IOI to Ryan Wilhelm for $1.4 million, but the sale fell through when Wilhelm lowered the price to $1 million. Detective Johnson testified that Wilhelm told her he did not end up buying IOI because "the business was a mess . . . , there [were] . . . tax problems . . . , account problems, too much that he could[n't] overcome." *Id.* at 29. Mertens later sold IOI to his nephew for $500,000.

[17]     At the conclusion of the August 15 hearing, the trial court stated, in relevant part:

> [T]he Court finds that the testimony of the State's witness[,] Ms. Johnson[,] to be credible and your [Clontz's] testimony to be not credible and the Court is going to find that you do owe $321,147.93 actual restitution for funds that were stolen and/or misappropriated to pay your personal expenses and funnel to relatives[.] [A]nd the Court is going to find that it is not at all unreasonable . . . that the business would have incurred the sum of $20,000.00 for fees from a certified public accountant both to meet with the IRS and to . . . attempt to write [sic] the business after you made . . . every attempt you could to run it into the ground. . . . I ran a law practice for twenty-five years and employed an accountant to take care of my tax situations and I know what it's like having paid every tax I ever owed even to deal with the IRS. I can't imagine what it was like to try to deal with the IRS after all of this occurred so the Court's going to find that the amount of $20,000.00 is a reasonable expense for CPA fees in this matter. I have no doubt in my mind that you also recklessly caused a gross loss of value in this business maybe because you were mad because the business wasn't being sold to

you and you thought that was your right instead of the right of the owner to determine who it would be sold to and maybe it's just because of your stealing from the business and creating all of these problems so that you made the business unmarketable[.] [B]ut I also have no question in my mind that if I were looking to buy a company and that company owed a bunch of back payroll taxes[—]which often businesses are actually shut down because of that and they always owe penalties and they always owe fees and there are always CPA fees or legal fees associated with that[—]I myself would have some trepidation about buying that business with all that going on. In addition to the fact that you caused a loss of reputation for the business both because of the failings with the IRS and also because of the fact that these are government contracts and you interfered with those and it's a little bit difficult to determine the amount of loss[.] I do think that it's reasonable to believe that Mr. Mertens is selling the business to his nephew at a discount because it's a family member and I'm sure that that's correct so I don't believe that you caused that loss in that amount[.] [B]ut I do believe that you caused the loss of the sale of the business to Mr. Wilhelm through your actions and it might have even been on purpose. I'm just not sure. That's probably $400,000.00 and then you testified that you were nice enough that you also paid some expenses of this company where you were basically using it to run your other business and using its equipment so I'm not sure that's not a wash[.] [B]ut I'm going to find that you caused the loss of the value of the business and the sale of the business in the amount of $300,000.00 so the total restitution will be $321,147.93 for unauthorized transactions and conversion on your part $20,000.00 for CPA fees caused by your action and $300,000.00 for the loss of the value of the business.

Tr. at 72-74.

[18]    On August 17, the trial court issued its Order on Restitution in which it stated, in relevant part:

The Court . . . now finds and ORDERS as follows:

1. The Defendant shall pay restitution of $321,147.93 to Thomas Mertens/Indiana Ordinance [sic], Inc. for funds stolen from Indiana Ordinance [sic].

2. The Defendant shall pay restitution in the sum of $20,000 to Thomas Mertens for CPA fees incurred by the victim as a result of criminal actions of Defendant.

3. Defendant shall pay the sum of $300,000 restitution to Thomas Mertens for the loss of marketability/business sale value of Indiana Ordinance [sic] caused by the criminal acts of Defendant[].

Appellant's App. Vol. III at 195.

[19]   The trial court initially ordered Clontz to make monthly restitution payments in the amount of $800. However, the trial court conducted an additional examination of Clontz's ability to pay restitution at a hearing on August 29. Clontz testified that she worked at her mother's bake shop thirty to thirty-five hours per week, making $7.50 per hour, and she provided supporting documentation that was introduced into evidence. Clontz testified that, although she had eighteen years of experience in banking, she did not have a better-paying job because she had a felony that made it difficult for her to get a job that would pay well. As of August 29, 2016, Clontz had earned $3,855 for all of 2016. Clontz's average weekly income was $240 to $260. She testified that her husband, Robert, was self-employed but, at the time of the hearing, he had not worked in the last four months. She testified that Robert was looking

for employment. She also testified that she had one minor child living with her and Robert. Because of her low income, Clontz requested that she pay $100 per month in restitution to IOI. However, the trial court ordered Clontz to make monthly payments of $250. This appeal ensued.

# Discussion and Decision

## *Issue One: Order to Pay Restitution*

Our standard of review of a restitution order is clear:

> "[A] trial court has the authority to order a defendant convicted of a crime to make restitution to the victim[ ] of the crime." *Henderson v. State*, 848 N.E.2d 341, 345 (Ind. Ct. App. 2006) (citing I.C. § 35-50-5-3). "The principal purpose of restitution is to vindicate the rights of society and to impress upon the defendant the magnitude of the loss the crime has caused." *Pearson v. State*, 883 N.E.2d 770, 772 (Ind. 2008), *reh'g denied*. "Restitution also serves to compensate the offender's victim." *Id*. An order of restitution lies within the trial court's discretion and will be reversed only where there has been an abuse of discretion. *Kays v. State*, 963 N.E.2d 507, 509 (Ind. 2012). A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law. *Gil v. State*, 988 N.E.2d 1231, 1234 (Ind. Ct. App. 2013).

*Dull v. State*, 44 N.E.3d 823, 829 (Ind. Ct. App. 2015).

"A restitution order must be supported by sufficient evidence of actual loss sustained by the victim or victims of a crime." *Gil*, 988 N.E.2d at 1235 (quoting *Rich v. State*, 890 N.E.2d 44, 49 (Ind. Ct. App. 2008)); *see* Ind. Code § 35-50-5-

3(a)(1) (2016). "Evidence supporting a restitution order is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." *J.H. v. State*, 950 N.E.2d 731, 734 (Ind. Ct. App. 2011) (internal quotations and citations omitted) (holding estimates with no additional evidence were mere speculation or conjecture). The State has the burden of proof in a restitution proceeding to establish a nexus between missing funds and the defendant's criminal activity. *Morgan v. State*, 49 N.E.3d 1091, 1094 (Ind. Ct. App. 2016). Moreover, because restitution is penal in nature, the statute providing for restitution must be strictly construed against the State to avoid enlarging it beyond the fair meaning of the language used. *Id.*

[22] Here, the trial court ordered Clontz to pay: (1) $321,147.93 in funds stolen from IOI; (2) $20,000 for IOI's CPA fees; and (3) $300,000 for the loss of IOI's value as a business. We address each basis for the restitution order in turn.

*$321,147.93 in Stolen Funds*

[23] Clontz asserts that the trial court abused its discretion when it ordered her to pay IOI $321,147.93 for funds she stole. The basis for that dollar amount was Detective Johnson's testimony and State's Exhibit 1. However, Detective Johnson admitted that she did not review each transaction in Exhibit 1 with anyone at IOI and that she had no IOI documentation to show that each transaction was in fact unauthorized. Rather, she testified that she had reviewed IOI's bank records for the relevant period of time and "tried to see what was reasonable." Tr. at 22. She testified that the transactions she listed in

Exhibit 1 were the transactions she "felt . . . raised a flag" or appeared to be in the wrong account. *Id.* Detective Johnson's testimony shows that she delved no further into each transaction to determine which transactions were actually unauthorized. She did not, for example, go through each transaction with Mertens or Clontz to determine whether IOI had authorized each transaction or to obtain some background that might explain each transaction. Nor did Detective Johnson explain why the transactions in Exhibit 1 that did *not* list Clontz, her relatives, or her business as recipients of the funds were nevertheless evidence of Clontz's unauthorized use of IOI funds.

[24] For example, transactions 18 through 21 in State's Exhibit 1 are checks from IOI's bank account made payable to the Sheriff of Marion County. But the State failed to provide evidence as to why those transactions were unauthorized. Clontz provided evidence that those transactions were IOI payments for past due taxes, Appellant's App., Confidential Vol. II, at 178-179, and the State provided no evidence to contradict her explanation. While we do not reweigh the evidence or judge the witnesses' credibility on appeal, we nevertheless require evidence beyond mere speculation to support the amount of the restitution order. *See, e.g.*, *J.H.*, 950 N.E.2d at 734.

[25] There is evidence that some of the transactions in State's Exhibit 1 were unauthorized. Clontz admitted that she had incorrectly used IOI funds totaling $10,796.49 for personal matters. Defendant's Exhibit A. However, there is no evidence to support Detective Johnson's testimony that all of the *other* transactions in State's Exhibit 1 were unauthorized, and the alleged lack of

authorization for those transactions it is not obvious from the face of Exhibit 1. Detective Johnson's testimony that all the transactions in Exhibit 1 were unauthorized, even those not clearly given to Clontz, her family or her business, is simply speculation. Because the restitution order to pay approximately $310,351.44, not including those transactions Clontz has admitted were unauthorized, is not supported by sufficient evidence, we remand this matter to the trial court to hold another hearing on restitution. *Garcia v. State*, 47 N.E.3d 1249, 1253 (Ind. Ct. App. 2015) ("[O]ur Indiana Supreme Court has held that when the record contains insufficient evidence to support an order of restitution, the case may be remanded for the trial court to hold another hearing.") (citing *Iltzsch v. State*, 981 N.E.2d 55, 57 (Ind. 2013)), *trans. denied*. On remand, the trial court should require sufficient evidence from the State to show that each of the other approximately $310,351.44 in transactions in State's Exhibit 1, which Clontz has not admitted were unauthorized, were unauthorized transactions.

*$20,000 in CPA Fees*

[26]     Clontz contends that IOI's CPA fees are not compensable as restitution. We agree. Indiana Code Section 35-50-5-3, in relevant part, allows a restitution order for earnings lost by the victim as a result of the crime.[5] I.C. § 35-50-5-

---

[5] We reject the State's contention that Indiana Code Section 35-50-5-3(a)(1), which allows restitution for property damages as shown by the actual cost of repair, applies here. The State cites no authority in support of that contention. And we note that IOI's hiring of CPAs to investigate its finances was not a "repair" to the

3(a)(4). However, while an expenditure for fees to investigate a victim's finances "may give rise to a civil claim by the [victim] against [the defendant], . . . it is not an appropriate claim for criminal restitution." *Lang v. State*, 911 N.E.2d 131, 136 (Ind. Ct. App. 2009); *see also Henderson v. State*, 848 N.E.2d at 346 (noting that "earnings lost" applies to money the victim lost, not money the victim expended to investigate how much money it lost). Here, as in *Henderson*, the victim seeks money that it *expended*, not money that it *lost*. Thus, while IOI may have a civil claim against Clontz for its CPA fees, it may not recover those fees as restitution under Indiana Code Section 35-50-5-3. *Id.; Lang*, 911 N.E.2d at 136. The trial court abused its discretion when it ordered Clontz to pay $20,000 for the fees IOI expended to investigate its finances, and we reverse that part of the order.

### *$300,000 for Lost Value of Business*

[27]     Finally, Clontz contends that the trial court abused its discretion when it awarded IOI $300,000 for the lost value of its business.[6] We disagree. As noted above, Indiana Code Section 35-50-5-3(a)(4) allows an award of restitution for earnings lost by the victim as a result of the crime. "[W]hen an established

---

business, even assuming the business as a whole is considered to be "property" within the meaning of the statute.

[6] Clontz also asserts, without citation to any authority, that the trial court abused its discretion because IOI did not ask for $300,000 in lost profits and the court may not order restitution that was not specifically requested by the victim. However, the statute allows the court to award restitution for lost profits if there is evidence to support such an award; it does not impose an additional requirement that any such award be specifically requested by the victim. I.C. § 35-50-5-3(a)(4). Moreover, IOI did claim a $300,000 loss due to Clontz's "embezzlement." State's Ex. 2.

business is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business, with interest, by reason of the wrongful act. The diminution may be measured by loss of profit." *Serletic v. Noel*, 700 N.E.2d 1159, 1162 (Ind. Ct. App. 1998) (internal quotations and citations omitted); *see also*, *Wittl v. State*, 876 N.E.2d 1136, 1138 (Ind. Ct. App. 2007) (noting that, under Indiana Code Section 35-50-5-3(a)(4), "lost earnings" includes a business' loss of income), *trans. denied*.

[28]    Here, Detective Johnson's testified that Wilhelm had initially offered to buy IOI for $1.4 million but, after reviewing IOI's finances and discovering "account problems," Wilhelm lowered his price to $1 million. Tr. at 29. That was sufficient evidence of a loss of $400,000 in value of the business, which is $100,000 more than what the trial court ordered Clontz to pay as restitution. *See, e.g.*, *Romine v. Gagle*, 782 N.E.2d 369, 382 (Ind. Ct. App. 2003), *trans. denied*; *Warrick Cty. v. Waste Mgmt. of Evansville*, 732 N.E.2d 1255, 1258 n.1 (Ind. Ct. App. 2000).[7] Given the evidence of the loss in IOI's value due to Clontz's mishandling of IOI funds, we cannot say the trial court abused its discretion in awarding $300,000 in lost profits.

---

[7] Mertens eventually sold IOI to his nephew for the discounted price of $500,000. However, it is undisputed that $500,000 is not the actual fair market value of the business but, rather, a discounted price for a family member. Tr. at 73 (trial court noting that Mertens sold the business to his nephew "at a discount because it's a family member;" therefore the court did not use the $500,000 sale price in calculating the loss of value to the business). It was within the trial court's discretion to base the lost value of the business on the only nondiscounted offer that was accepted by the owner—$1.4 million.

### *Issue Two: Amount of Monthly Restitution Payments*

[29]   Clontz separately challenges the trial court's order that she pay the amount of $250 per month to IOI in restitution as a condition of her probation. Clontz asserts that her income is too low to pay that much, and she asks that we revise the order to require monthly payments of $100.

[30]   When a trial court orders "restitution . . . as a condition of probation, the court shall fix the amount, which may not exceed an amount the person can or will be able to pay." *Pearson*, 883 N.E.2d at 772; I.C. § 35-38-2-2.3. The statute "requires that *the trial court* engage in some inquiry of the defendant to determine his or her ability to pay restitution," even if the parties present no evidence on that issue. *Bell v. State*, 59 N.E.3d 959, 964 (Ind. 2016) (emphasis original). This requirement is meant to "prevent indigent defendants from being imprisoned because of a probation violation based on a defendant's failure to pay restitution." *Pearson*, 883 N.E.2d at 772.

[31]   Although "the statute does not specify the extent to which the court must inquire to determine the defendant's financial status," *Smith v. State*, 990 N.E.2d 517, 522 (Ind. Ct. App. 2013), *trans. denied*, the trial court should consider, among other things, information regarding the defendant's financial information, health, and employment history, *Bell*, 59 N.E.3d at 964. The amount and manner of restitution payments must be supported by evidence in the record, and the court must explain how it reaches its determination that the defendant would have the ability to make the ordered restitution payments. *Id*. A trial court's order of restitution is reviewed for abuse of discretion. *Kays v.*

*State*, 963 N.E.2d at 509.  Imposition of restitution is a form of punishment and although it may cause some hardship, the trial court has discretion to determine the extent of the hardship and whether the defendant can still subsist after the restitution payments.  *Mitchell v. State*, 559 N.E.2d 313, 315 (Ind. Ct. App. 1990), *trans. denied*.

[32]   The trial court conducted an examination of Clontz's ability to pay restitution. The only evidence as to Clontz's income was her own testimony and supporting exhibits, which showed that she worked at her mother's bake shop thirty to thirty-five hours per week, making $7.50 per hour.  Clontz testified that, although she had eighteen years of experience in banking, she did not have a better-paying job because she had a felony conviction, which made it difficult for her to get a job that would pay well.  She testified that Robert was self-employed but, at the time of the hearing, he had not worked in the last four months.  Therefore, according to Clontz's evidence, her family of three was entirely dependent upon her income alone, which was a yearly gross income of approximately $12,000.  That amount is well below the federal poverty threshold.[8]  The State presented no evidence to rebut Clontz's evidence of her inability to pay monthly restitution above $100.  Nevertheless, the trial court

---

[8]  The Federal Poverty Guidelines for 2016 establish that families of three with a household income of $20,160 or less were living below the poverty threshold.  *See* https://aspe.hhs.gov/computations-2016-poverty-guidelines.

ordered Clontz to pay $250 per month in restitution, an amount equal to approximately one-fourth of her total gross income.[9]

[33] The trial court specifically found Clontz's testimony that she could not find a better-paying job "not credible," Tr. at 72, and we do not reweigh witness credibility on review. However, we do require some evidence of the defendant's ability to pay the restitution amount ordered—i.e., $250 per month—and no such evidence exists on this record. Although there was evidence of Clontz's significant experience in banking, there was no evidence of what income a person with such experience might have. Nor was there any evidence of how much Clontz's actual income was during her years of banking. The trial court's order that Clontz pay more than twenty-five percent of her gross monthly income in restitution without an explanation of how the evidence shows that Clontz could afford such a payment was an abuse of discretion. *Bell*, 59 N.E.3d at 966. We remand to the trial court for a new hearing at which the parties may present evidence as to how much Clontz can or will be able to pay monthly in restitution.

---

[9] As Clontz notes, that amount is more than the maximum amount that could be garnished from her earnings. *See* I.C. § 24-4.5-5-105(2) (emphasis added) (noting the maximum amount that can be garnished from a person's earnings to enforce the payment of a judgment is "twenty-five percent (25%) of the individual's *disposable* earnings.").

# Conclusion

[34] The trial court's order that Clontz pay $321,147.93 for funds she stole from IOI was not supported by sufficient evidence. Accordingly, we reverse that part of the trial court's order and remand with instructions to conduct a new restitution hearing at which both the State and Clontz may present additional evidence bearing on the restitution owed to IOI. The trial court abused its discretion when it ordered Clontz to pay $20,000 for CPA fees, and we reverse that part of the trial court's order. The trial court did not abuse its discretion when it ordered Clontz to pay $300,000 for IOI's lost profits. However, the trial court abused its discretion when it ordered Clontz to pay $250 in monthly restitution payments without evidence that Clontz could afford such a payment, and we reverse that part of the trial court's order and remand for such a determination.

[35] Affirmed in part, reversed in part, and remanded with instructions.

Bailey, J., and May, J, concur.