

**FILED**

Sep 30 2015, 10:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Nathaniel S. Connor
Union City, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl M. Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Logan M. Dull,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 30, 2015<br><br>Court of Appeals Case No.<br>68A04-1502-CR-75<br><br>Appeal from the Randolph Circuit Court<br><br>Trial Court Cause No.<br>68C01-1401-FD-30<br><br>The Honorable Jay L. Toney, Judge |

**Pyle, Judge.**

## Statement of the Case

[1] Logan M. Dull ("Dull") appeals the trial court's restitution order. Dull was charged by indictment with one count of Class D felony theft for stealing grain

during the Summer or Fall of 2013.[1]  He pled guilty as charged, and, as part of his plea agreement, he agreed to pay restitution.  When setting forth his factual basis for the crime, he admitted that he stole grain from the victim on or about one day that fell within the dates in the indictment.  During the sentencing and restitution hearings, Dull admitted that he had stolen grain from the victim on two other occasions, and he agreed to pay restitution for these three occasions within the time period of the indictment.  The trial court ordered him to pay $145,633.40 in restitution, and this amount included grain that Dull had sold up to one year prior to the dates contained in the indictment.

[2]  On appeal, Dull challenges only the amount of restitution ordered.  Specifically, he argues that the trial court abused its discretion by ordering him to pay $145,633.40 in restitution because part of that amount was based on uncharged acts to which he neither pled guilty nor agreed to pay restitution.  We agree with Dull's assertion.  Absent an agreement to pay restitution, a defendant may not be ordered to pay restitution for an act that did not result in a conviction.  Because the trial court ordered restitution for amounts that related to dates outside Dull's indictment for which he did not plead guilty and for which he did not agree to pay, we reverse the trial court's order of restitution.  However, because Dull did agree to a specific amount of restitution that fell within the

---

[1] IND. CODE § 35-43-4-2(a).  We note that, effective July 1, 2014, a new version of the theft statute was enacted and that Class D felony theft is now a Class A misdemeanor.  Because Dull committed his crime in 2013, we will apply the statute in effect at that time.

dates contained in the indictment, we remand to the trial court to enter an order for that specific amount.

[3] Reversed and remanded.

# Issue

Whether the trial court abused its discretion by ordering Dull to pay $145,633.40 in restitution to the victim.

# Facts

[4] In January 2014, a grand jury indicted Dull for one count of Class D felony theft. The indictment provided, in relevant part, that:

> LOGAN DULL, on or about various times in the summer or fall of 2013, in Randolph County[,] State of Indiana, did knowingly exert unauthorized control over the property of Kenny Beshears (DBA Stone Station Elevator and Ridgeville Elevator), to wit: grain, with the intent to deprive said person of any part of the value or use of said property . . . .

(App. 119).[2]

[5] On August 20, 2014, Dull entered into a written plea agreement, in which he agreed to plead guilty as charged in the indictment. The parties agreed that

---

[2] We note that Dull's Appellant's Appendix contains a copy of his presentence investigation report ("PSI")—which is marked "**Confidential** Pursuant to IC 35-38-1-13"—and that he did not print it on green paper as required under Indiana Administrative Rule 9(G)(5)(b). Contemporaneously with the issuing of this opinion, we order Dull's appellate counsel to file an amended appendix wherein the PSI is printed on green paper in compliance with Indiana Administrative Rule 9.

Dull would be "sentenced to a term of two (2) years" and that "said term shall be suspended except one hundred eighty (180) days to be served on home detention." (App. 59). The parties also agreed that Dull would be placed on probation "with the length and terms to be determined by th[e] Court." (App. 59). Additionally, Dull agreed that he would "pay restitution as ordered by th[e] Court." (App. 60).

[6] On October 29, 2014, the trial court held a guilty plea and sentencing hearing. During the guilty plea portion of the hearing, Dull's attorney questioned him in order to lay the factual basis for his plea. Dull admitted that "on or about August 20th of 2013," he and another person went to Stone Station and Ridgeville Elevators, which were owned by Beshears, and took grain without Beshears's permission. (Tr. 13). Thereafter, the prosecutor—after confirming that Dull understood that he was being charged with and would be convicted of only one count of theft "no matter what [he] sa[id] here today[,]"—asked him if there were "other thefts that occurred[.]" (Tr. 14). Specifically, the prosecutor asked Dull about his statement to police in which Dull admitted that he had gone to Beshears's grain elevator on three occasions and had stolen grain. Dull confirmed that he had stolen grain from Beshears on two additional occasions and had told the police about it.

[7] The trial court determined that "there [wa]s a factual basis for the plea[,]" took the plea under advisement, and then proceeded to sentencing. During that portion of the hearing, Dull testified that he worked on and operated his family's farm, which was owned by his mother. He explained that the farm's

operations included "[c]attle, hay, and . . . some exotic birds[,]" and he testified that he made "[g]ross probably forty, fifty thousand" dollars per year.[3] (Tr. 16). Dull also testified that he was aware that Beshears was seeking approximately $147,000.00 in restitution,[4] but he asserted that he would not be able to pay that amount.

[8] Beshears testified during the sentencing hearing and expressed his dissatisfaction with Dull's plea agreement. Specifically, Beshears stated he did not "feel like six months home detention and some probation [wa]s punishment for the crime[,]" especially where Dull's crime occurred on "dozens of occasions" over "an eighteen month period[.]" (Tr. 17, 18). Beshears also testified that he had not filed an insurance claim for any of the stolen grain.

[9] As an exhibit, the prosecutor offered a check that was made out to Dull from "The Andersons" ("Andersons"), the grain company that bought grain from Dull. (State's Sentencing Ex. 1). The check, which was written for $1,667.20 and dated September 16, 2013, was being held by the Ridgeville Police Department. The prosecutor then requested that the trial court defer an order on restitution until the State could obtain the remaining records from Andersons for the other occasions that Dull had sold it grain that he had stolen from Beshears. When questioned by the trial court, Dull admitted that he had

---

[3] As shown in his PSI, Dull also reported to the probation department that he operated and managed his family's farm and that he earned between $40,000.00 and $50,000.00 per year.

[4] Beshears completed a Victim Impact Statement and requested $147,953.69 in restitution.

taken grain, which had been stolen from Beshears, to Andersons and that he had been issued a check from Andersons for that stolen grain. Dull, however, denied that there were more than two other occasions when he did so. The trial court then asked Dull:

> COURT:    So you wouldn't have any objection then if that was stolen grain for the Court to order you to reimburse Mr. Beshears for the amounts of those shipments. . .
>
> [DULL]:    Right.
>
> COURT:    Or truckloads correct?
>
> [DULL]:    Right. Correct.

(Tr. 21). After Beshears again pointed out that there were "not just two or three" occasions, the trial court re-questioned Dull:

> COURT:    So Mr. Dull were there other times you would have received checks from the Anderson's [sic] other than from stolen grain from Mr. Beshears['] operations?
>
> [DULL]:    No.
>
> COURT:    Those would be the only checks you would have would be the money that was owed to Mr. Beshears correct?
>
> [DULL]:    Yes sir.

(Tr. 22). The prosecutor then requested to obtain those checks to submit as "a fair legitimate request for restitution." (Tr. 22). The trial court granted the request, stating that "Mr. Dull has admitted that any checks he received from the Anderson's [sic] would have been for stolen grain[.]" (Tr. 22).

[10] In regard to restitution, Dull's counsel requested that "restitution be limited to the two or three occasions that [Dull] ha[d] admitted to today[,]" and pointed out that the indictment alleged that the theft occurred "in the summer or fall of 2013[.]" (Tr. 24). His counsel also argued that Dull did not have the ability to pay Beshears's requested amount of $147,000 in restitution because Dull was "only earning forty to fifty thousand dollars a year." (Tr. 24).

[11] The trial court expressed its doubt about its authority to order that much in restitution for a Class D felony theft conviction because "by statute [it] would be something less than a hundred thousand dollars[.]" (Tr. 25).[5] In response, the prosecutor pointed out that, while the indictment to which Dull pled guilty contained one count, it had alleged that Dull had committed the offense "on or about various times . . . so that mean[t] there [we]re more than one specific theft amounts." (Tr. 25).

[12] The trial court then accepted Dull's guilty plea and, pursuant to the plea agreement, imposed a sentence of two years, with 180 days executed on home detention and 550 days suspended. It ordered Dull to serve one and one-half years on probation and, as a condition of his probation, ordered him to pay restitution to Beshears "in an amount and in accordance with a schedule to be established by the Randolph County Probation Department." (App. 43). The

---

[5] At the time of Dull's offense, a charge of Class D felony theft was for property stolen with a fair market value of less than $100,000, while a charge of Class C felony theft was for property stolen with a fair market value of at least $100,000. *See* I.C. § 35-43-4-2 (2013).

trial court also ordered the Ridgeville Police Department to release the proceeds contained in State's Exhibit 1 to Beshears.

[13] Thereafter, on November 25, 2014, the probation department filed a Report on Restitution ("restitution report"), asserting that it had determined that the amount of restitution should be $145,633.40. Attached to the restitution report, the probation department submitted a list, which showed the checks (with dates and check amounts) that Andersons had paid to Dull. This list showed that Andersons had issued thirty-five checks to Dull between May 2012 and December 2012, and it had issued thirty-five checks to him between January 2013 and September 2013. These seventy checks totaled $145,633.40.

[14] On January 19, 2015, the trial court held a restitution hearing. To establish the actual loss to Beshears, the State did not present any evidence from Beshears showing how much grain was taken on a specific date or the value of grain taken on different dates. Instead, it relied on records from Andersons, showing checks it had issued to Dull for grain that he had sold. Specifically, the State offered State's Exhibit 1, which consisted of numerous "grain settlement statements" showing the total amounts that Andersons had paid to Dull for the purchase of grain.[6] The State also offered State's Exhibit 2, which was a list

---

[6] State's Exhibit 1 contained thirty-three statements, dating from January 7, 2013 to August 20, 2013, and thirty-six statements dating from May 9, 2012 to December 17, 2012.

summarizing all of the checks contained in Exhibit 1.[7] (Tr. 34). Dull did not object to the State's exhibits.

[15] When asked about his work and financial situation, Dull first testified that he was not employed because he was working on his mother's farm and taking care of the animals. He also acknowledged that he was not disabled. Additionally, he testified that he had a two-year-old child but indicated that he did not pay court-ordered child support. When asked if there was any reason why he could not go out and find employment to pay restitution, Dull then replied that he could not because he was employed by working on his mother's farm. He testified that he did not earn a paycheck for working on the farm and that, instead, he received room and board from his mother. He also testified that his mother provided him with a car, paid for gas, and provided him with money if he wanted to go to the store and buy a pop. Dull stated that he had $30.00 in his bank account and that, because he lived with his mother, he had "everything right there." (Tr. 42). In support of his argument that he did not make any money working on the farm, he testified that he had not filed a tax return for 2013 or 2014. He testified that he was current with his home detention and probation user fees because his "mother help[ed] [him] out with that whatever, if [he] need[ed] a little for that." (Tr. 47).

---

[7] State's Exhibit 2 was the same list that the probation department had attached to its restitution report and showed that Andersons had issued checks, totaling $145,633.40, to Dull.

[16]   In regard to restitution, Dull acknowledged that he had agreed in his plea agreement to pay restitution, but he challenged the amount of restitution that he would be required to pay. Dull's counsel argued that Dull would not be able to pay the amount of restitution requested by the State because Dull "really doesn't even have a pot to piss in." (Tr. 53). Dull also challenged the request for restitution that dated back before the summer of 2013, arguing that the grand jury indictment alleged the theft had occurred in the summer or fall of 2013. Dull's counsel argued that, during that relevant time period in the indictment, there were fourteen transactions between June 5 and September 13, 2013 that totaled $26,110.98.[8] Dull also pointed out that, as part of his guilty plea, he had admitted to going to Beshears' grain elevator in August 2013. He did not, however, dispute that all the checks contained in State's Exhibit 1 were from stolen grain. Instead, he argued that he was not the one who took it from Beshears's grain elevator and questioned whether it was even from Beshears's elevator. Dull claimed that he had stolen "[v]ery little" from Beshears and testified that he had gone to Beshears's elevator and had taken "three loads max from Mr. Beshears." (Tr. 50). Dull testified that he did not know the origin of the rest of the stolen grain because his disabled drug dealer, Perry Weiss ("Weiss"), had brought it to him to sell to Andersons.[9]

---

[8] We note that the total amount for the fourteen transactions between these two dates actually totals $27,778.18.

[9] Dull stated that Weiss gave the grain to him to sell because Weiss, who was on disability, did not want to have his name on the checks. Weiss was not indicted by the grand jury.

At the conclusion of the restitution hearing, the trial court stated:

> Mr. Dull[,] the Court's [sic] not buying any of this as far as you not having anything. Alright. I don't know whether they are straight out lies or you just don't want to come forward with the truth. That doesn't mean that I can order all this restitution. I am going to review the records and go back through this file and see exactly what information I do have. If you don't own anything or have anything I think that is just part of your idea is keeping yourself from being collectable and keeping someone else from being able to get this money from you. Your [sic] a thief. You were involved in stealing a hundred and forty-five thousand dollars of property. What I have to look at is whether it has been shown that this came from Mr. Beshears and if that's not been shown I am not going to order you to pay it. It[']s that simple. That doesn't stop Mr. Beshears from coming back after you later in some kind of civil case, that's something that he would have to decide. But your little show that you put on in here about, gee I don't have anything, mom will buy me a pop now and then. I am not buying it and I don't think anybody else is either. But I will make the appropriate Order based upon the information that has been presented to me.

(Tr. 55).

Subsequently, on January 22, 2015, the trial court issued an Order on Restitution ("restitution order"), which provided in part:

> 2. That on November 25, 2014, Jason Huxold, filed a Report on Restitution indicating that the Probation Department determined that restitution in this cause should be $145,633.40.
>
> 3. That pursuant to testimony given at the Sentencing Hearing on October 29, 2014, the only checks that Defendant received . . .

from The Anderson's [sic] were for grain stolen from Kenny Beshears' business.

4.  That Defendant is able-bodied.

5.  That Defendant does not have employment other than farming.

6.  That Defendant chooses not to be employed away from the family farm, as he enjoys farm work.

7.  That Defendant is otherwise financially support[ed] by his mother.

8.  That at his Guilty Plea Hearing, Defendant stated that he did not receive any checks from The Anderson's [sic] that were not from grain stolen from [Beshears's] Stone Station Elevator.

9.  That the Defendant should pay restitution to Kenny Beshears in the amount of $145,633.40.

10.  That the Defendant should pay $500.00 per month to the Clerk of Randolph Circuit Court to be applied to restitution due and owing in this matter, beginning February 1, 2015, and continuing on the 1st day of each month thereafter.

(App. 26-27).  Dull now appeals the trial court's restitution order.[10]

# Decision

As Dull's plea agreement called for him to pay restitution, he does not challenge the fact that he is required to pay restitution.  Instead, he challenges the amount of restitution ordered by the trial court.  Dull argues that the trial court erred when it ordered him to pay $145,633.40 in restitution because:  (1) it

---

[10] During the pendency of this appeal, on March 3, 2015, the State filed a notice of probation violation, alleging that Dull had violated his probation by failing to pay restitution as ordered by the trial court.

failed to inquire into his ability to pay; (2) the restitution order was based on uncharged acts; (3) the amount was based on insufficient evidence of actual loss; and (4) the amount was greater than allowed for a Class D felony theft.

[20] "[A] trial court has the authority to order a defendant convicted of a crime to make restitution to the victim[] of the crime." *Henderson v. State*, 848 N.E.2d 341, 345 (Ind. Ct. App. 2006) (citing I.C. § 35-50-5-3). "The principal purpose of restitution is to vindicate the rights of society and to impress upon the defendant the magnitude of the loss the crime has caused." *Pearson v. State*, 883 N.E.2d 770, 772 (Ind. 2008), *reh'g denied*. "Restitution also serves to compensate the offender's victim." *Id.* An order of restitution lies within the trial court's discretion and will be reversed only where there has been an abuse of discretion. *Kays v. State*, 963 N.E.2d 507, 509 (Ind. 2012). A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law. *Gil v. State*, 988 N.E.2d 1231, 1234 (Ind. Ct. App. 2013).

[21] We first address Dull's argument that the trial court failed to inquire into his ability to pay restitution. It is undisputed that Dull's restitution was a condition of his probation. When restitution is a condition of probation, a trial "court shall fix the amount, which may not exceed an amount the person can or will be able to pay, and shall fix the manner of performance." I.C. § 35-38-2-2.3(a)(6). Thus, a trial court is required to inquire into a defendant's ability to pay when it orders restitution as a condition of probation. *Pearson*, 883 N.E.2d at 772. While this statute requires such an inquiry, the statute does not specify

the extent to which a trial court must inquire into a defendant's financial status, *Smith v. State*, 990 N.E.2d 517, 522 (Ind. Ct. App. 2013), *trans. denied*, nor does it set forth a precise procedure for determining a defendant's ability to pay. *Kays*, 963 N.E.2d at 509. However, the inquiry generally may include factors such as a defendant's "financial status, health, and employment history." *Laker v. State*, 869 N.E.2d 1216, 1221 (Ind. Ct. App. 2007) (citing *Champlain v. State*, 717 N.E.2d 567, 570 (Ind. 1999)). A trial court is not required to hold a hearing on a defendant's ability to pay restitution and, instead, "may make a proper inquiry, depending on circumstances, by such actions as reviewing the pre-sentence report and questioning witnesses." *Id.* (citing *Polen*, 578 N.E.2d at 758-59). The inquiry into a defendant's ability to pay when restitution is a condition of probation is required "in order to prevent indigent defendants from being imprisoned because of a probation violation based on a defendant's failure to pay restitution." *Pearson*, 883 N.E.2d at 772.

[22] The State asserts that the trial court properly inquired into Dull's ability to pay and contends that Dull's challenge to his ability to pay is merely an invitation to reweigh the trial court's finding that he had the ability to pay. We agree.

[23] Here, it is clear from the record before us that there was not a failure to inquire into Dull's ability to pay restitution. During the sentencing hearing, Dull testified that he worked on and operated his family's farm and that he made "[g]ross probably forty, fifty thousand" dollars per year. (Tr. 16). When interviewed for the PSI, Dull also reported to the probation department that he operated and managed his family's farm and that he earned between $40,000.00

and $50,000.00 per year. Additionally, during the sentencing hearing, Dull's counsel also stated that Dull earned "forty to fifty thousand dollars a year." (Tr. 24). Then, during the restitution hearing, when asked about his work and financial situation, Dull acknowledged that he was not disabled and that he did not pay court-ordered child support for his child. He also testified that he was employed by working on his mother's farm, but he claimed that did not earn a paycheck for working on the farm and that, instead, he received room and board from his mother. He also testified that his mother provided him with a car, paid for gas, and provided him with money for his needs. The trial court, however, did not find Dull's testimony regarding his lack of ability to pay to be credible. In its restitution order, the trial court made findings regarding Dull's ability to pay and ultimately determined that Dull had the ability to pay $500 per month for restitution. Given the record on appeal, and because we will not reweigh the trial court's credibility determination, we conclude that Dull's argument that the trial court did not consider his ability to pay is without merit. *See, e.g.*, *Champlain*, 717 N.E.2d at 570-71 (holding that the trial court had met the statute's requirement to inquire into the defendant's ability to pay where the defendant discussed his assets and employment); *Polen*, 578 N.E.2d at 758 (holding that the "trial court's inquiry into [the defendant's] ability to pay certainly met the statutory requirement" where the trial court heard testimony from defendant and her spouse testified regarding her employment and financial status and where the trial court had reviewed the PSI, which contained similar information); *Mitchell v. State*, 559 N.E.2d 313, 314-315 (Ind. Ct. App. 1990) (explaining that the trial court's review of the PSI, which

contained information about the defendant's employment, finances, and health, was "adequate" to meet the statutory requirement of inquiring into the defendant's ability to pay for restitution), *trans. denied.*

[24] Turning to Dull's argument that the restitution order should be reversed because it was based on uncharged acts, we note that INDIANA CODE § 35-50-5-3(a), which governs restitution, provides that a "court shall base its restitution order upon a consideration of: (1) property damages of the victim incurred *as a result of the crime*, based on the actual cost of repair (or replacement if repair is inappropriate)[.]" (Emphasis added). The trial court cannot order a defendant to pay restitution for crimes to which he did not plead guilty, has not been convicted, or did not agree to pay as restitution. *See Polen*, 578 N.E.2d at 756-57. *See also Hill v. State*, 25 N.E.3d 1280, 1283 (Ind. Ct. App. 2015) ("Absent an agreement to pay restitution, a defendant may not be ordered to pay restitution for an act that did not result in a conviction.").

[25] Dull argues that the trial court abused its discretion by ordering him to pay $145,633.40 in restitution because that amount included "alleged losses from allegations of theft unrelated to [his] conviction[]" and because he agreed to pay restitution only for "the crime that he committed, but nothing more." (Dull's Br. 13). As he asserted at the restitution hearing, Dull contends on appeal that "[a]t most, restitution may be ordered in the amount of $26,110.98 for checks issued in the summer or fall [of] 2013." (Dull's Br. 9).

[26] The State argues that Dull should pay more than the $26,110.98 in restitution that he admits would have covered the amounts of grain sold to Andersons during the period covered by the indictment. Instead, the State contends that the trial court properly ordered him to pay $145,633.40 in restitution because he agreed in his plea agreement to pay restitution. The State also contends that the amount of restitution was proper because Dull agreed during the sentencing hearing "to pay restitution for the truckloads of grain he stole from Beshears whether he was charged for the thefts or not." (State's Br. 11).

[27] However, the State—seemingly recognizing that the trial court should not have ordered restitution for the uncharged acts—further argues that even if this Court were to reverse the restitution amounts ordered for the uncharged acts, "[n]othing would prevent the State from filing a charging information alleging thefts for the period outside of the period of the indictment, obtaining yet another felony conviction against Defendant, and using the evidence presented at the restitution hearing in this case to obtain an order for the remaining restitution[.]" (State's Br. 12). The State contends that "Defendant's admissions in this case would make conviction in a subsequent case little more than a formality as he has admitted that he only ever received payment from Anderson Grain Center in exchange for grain he stole from Beshears." (State's Br. 12). The State reasons that "[i]n short, no principle is served by reversing the trial court's restitution order and every indication is that the agreement to pay restitution in the plea agreement extended to all of the thefts of grain from Beshears." (State's Br. 12).

[28] We cannot agree with the State's assertions that the restitution ordered for Dull's uncharged acts was proper. First, Dull's plea agreement term under which he generally agreed to pay restitution did not justify the trial court's imposition of restitution for acts or crimes to which he did not plead guilty or of which he had not been convicted. *See Kinkead v. State*, 791 N.E.2d 243, 245 (Ind. Ct. App. 2003) (explaining that a term in a defendant's plea agreement under which the defendant agreed to pay restitution did not "in itself represent an agreement to pay a greater amount . . . than that resulting from the crime to which [the defendant] pleaded guilty"), *trans. denied*.

[29] Moreover, there is no indication in the record that Dull agreed to pay restitution to Beshears for all of the 2012 and 2013 payments he received from Andersons. Here, Dull was charged by indictment with one count of Class D felony theft for exerting unauthorized control over Beshears's grain "on or about various times in the summer or fall of 2013[.]" (App. 119). Dull pled guilty as charged and, as part of his factual basis, testified that he took grain from Beshears around August 20, 2013. He further admitted—after the State told him that he was being charged with and would be convicted of only one count of theft "no matter what [he] sa[id] here today[,]"—that he had gone to Beshears's grain elevator on two additional occasions and had stolen grain. (Tr. 14). Dull agreed to pay restitution for the grain he took from Beshears on three occasions. He did not specify what dates he took the grain from Beshears or what dates he sold that grain to Andersons. Dull, however, specifically argued, during both the sentencing and restitution hearings, that restitution

should be limited to these three occasions and by the dates in the indictment. Contrary to the State's assertion, it is clear that Dull did not agree to pay restitution for amounts that occurred prior to the summer of 2013.

[30] Because Dull did not plead guilty to committing theft of Beshears's grain prior to the summer of 2013 and because he did not agree to pay restitution for grain sold prior to that time period, the trial court abused its discretion by ordering him to do so. *See, e.g.*, *Hill*, 25 N.E.3d at 1283 (holding that the "trial court's restitution order was improperly based on uncharged acts" where it included "losses from allegations of theft unrelated to [the defendant's] convictions"); *Green v. State*, 811 N.E.2d 874, 879 (Ind. Ct. App. 2004) (holding that where the State chose not to pursue a criminal deviate conduct charge, the trial court could not order restitution for that charge because it did not result in a conviction); *Hipskind v. State*, 519 N.E.2d 572, 574 (Ind. Ct. App. 1988) (holding that the trial court erred by ordering the defendant to pay restitution for "uncharged illicit acts"), *trans. denied*. *See also James v. State*, 868 N.E.2d 543, 549 (Ind. Ct. App. 2007) ("James argues that the trial court abused its discretion in ordering him to pay restitution for a burglary to which he did not plead guilty . . . The State agrees."). *Cf. Kinkead*, 791 N.E.2d at 245 (holding that the defendant had agreed to pay restitution in an amount greater than the sums involved in the two counts of forgery to which he pled guilty when he stated at the sentencing hearing that he agreed to pay "'whatever restitution

amount that the Judge decide[d] [he] should pay'"). We, therefore, reverse the trial court's restitution order.[11]

[31]   Because the trial court could only order Dull to pay restitution for the theft of grain between the summer and fall of 2013 as set forth in the indictment and because Dull agreed that his restitution for that time period would be $26,110.98, plus the $1,667.20 check dated September 16, 2013, there is no need for the trial court to hold a new restitution hearing. Accordingly, we remand this case to the trial court with instructions to vacate its prior restitution order and to enter a new restitution order for the amount of $27,778.18, the amount that Dull agreed was proper for restitution.

[32]   Reversed and remanded.

Crone, J., and Brown, J., concur.

---

[11] Because we reverse the trial court's restitution order, we need not address Dull's remaining two challenges to that order.