

FILED

Mar 22 2019, 7:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Steven Linville,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 22, 2019

Court of Appeals Case No.
18A-CR-983

Appeal from the Ripley Circuit
Court

The Honorable Ryan King, Special
Judge

Trial Court Cause No.
69D01-1601-F6-20

**May, Judge.**

[1]     Steven Linville appeals following his convictions of three counts of Level 6

felony theft[1] and three counts of Level 6 felony making or delivering a false

---

[1] Ind. Code 35-43-4-2(a) (2014).

sales document.[2]  He argues his fifteen-year sentence is inappropriate and the order that he pay $98,310.30 in restitution is "obvious error."  (Br. of Appellant at 12.)  We affirm in part, and we reverse and remand in part.

# Facts and Procedural History

[2]  For about sixteen years, Linville was employed by Laughery Valley AG (hereinafter, "Laughery Valley").  On behalf of Laughery Valley, Linville delivered fuel, oil, washer fluid, and antifreeze to about four hundred customers.  In 2015, Laughery Valley began to suspect that Linville had been issuing false receipts to customers so that he could steal money from the payments due to Laughery Valley.  When Laughery Valley confronted Linville, he admitted he took the money.

[3]  On January 29, 2016, the State filed thirty-four counts against Linville for events occurring on seventeen separate dates between October 6, 2014, and October 21, 2015.  Seventeen of the counts alleged Linville committed Level 6 felony theft because he "sold property belonging to Laughery Valley AG to Bob's Service Station and accepted a check totaling [date-specific amount]. Steven D. Linville did not turn the funds over to the Laughery Valley AG." (Appellant's App. Vol. 2 at 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30.)  Seventeen other counts alleged Linville, on the same dates as the

---

[2] Ind. Code 35-43-5-2(b)(1) (2014).

seventeen thefts, "delivered a false receipt to Bob's Service Station for property belonging to Laughery Valley AG." (*Id*. at 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47.)

[4] On October 23, 2017, Linville entered an agreement whereby he would plead guilty to three counts of Level 6 felony theft[3] and three counts of Level 6 felony delivering a false sales document,[4] in exchange for the State dismissing the remaining twenty-eight counts. The agreement left the sentence for each count to the Court's discretion but required all counts be served consecutively. Finally, the agreement provided: "Defendant shall pay restitution to Laughery Valley AG. The restitution amount shall be determined by the Court following a Restitution Hearing." (*Id*. at 119.)

[5] On October 24, 2017, the trial court accepted that agreement, entered those six convictions, and ordered the production of a presentence investigation report. The victim impact statement filed by Laughery Valley indicated that, between May of 2011 and November of 2015, Linville "stole at least $369,426.59 worth of sales proceeds through his scheme." (*Id*. at 127.) At sentencing, Linville argued the court could not order him to pay more than $35,729.00, based on

---

[3] Linville pleaded guilty to Counts 1, 8, and 17, which occurred on October 6, 2014, March 19, 2015, and October 21, 2015, respectively.

[4] Linville pleaded guilty to Counts 20, 26, and 31, which occurred on November 13, 2014, April 16, 2015, and August 10, 2015, respectively.

the six counts to which Linville pled guilty. The trial court entered lengthy findings in support of its sentencing decision:

> I.      Under the terms of the Plea Agreement, Defendant faces a minimum sentence of 3 years and a maximum sentence of 15 years (180 days to 910 days on each count), with a total Advisory Sentence of 6 years.

> II.     The Defense asked for a sentence of probation or community corrections. The Prosecutor asked for a sentence of 15 years with 5 years suspended.

> III.    The AGGRAVATING FACTOR(S) are as follows:

> > a.     <u>The facts and circumstances of the crime go far beyond that necessary to prove Level 6 Felony Thefts</u>. The offenses to which the Defendant pleaded guilty could have been proven by Defendant having stolen just a few thousand dollars. The facts of this case show that the Defendant stole tens of thousands of dollars that he was charged with and the evidence further shows that he had been stealing from the victim well before the period for which he was charged. These facts are substantially more egregious than what would be necessary to prove the commission of the six Level 6 felonies. The significant value of the Defendant's theft is an aggravating factor of great weight.

> > b.     <u>Defendant violated a position of trust</u>. <u>First</u>, Defendant violated his employer's trust when he, on many occasions, misappropriated the employer's property knowing his employer had entrusted him to provide a service to their customers. <u>Second</u>, Defendant violated the trust of his employer's customers. Because the Defendant

violated the position entrusted to him to serve as the middle-man between his employer (the victim herein) and a significant number (approximately 350-400) of customers, the Court considers this two-prong violation of trust to be a significant aggravating factor of great weight.

c.      <u>Defendant committed the crime of theft outside the times alleged in this Cause.</u> Defendant is charged with committing crimes within a very narrow window of time; specifically, the theft of over $98,000 over the period of one year (October 2014 to October 2015). Defendant held his position for Laughery Valley for several years and other thefts, not brought within this case, were committed. The Court also recognizes that this aggravator is a basis for not affording the Defendant's lack of criminal history more weight, otherwise, this aggravator would have been heavier. Therefore, the Court considers this an aggravating factor and affords it moderate weight.

d.      <u>Defendant's actions have damaged Laughery Valley's business reputation in the community.</u> According to Keith Everheart [sic], Laughery Valley has lost customers due to the Defendant's actions. Further, customers of Laughery Valley, not alleged victims herein, appeared in the court room at sentencing, as they believe that they too have been wronged by the Defendant's actions. The damage done to the victim from the wedge driven by the Defendant between the victim and its customers is palpable. The Court gives this aggravating factor moderate weight.

IV.    The MITIGATING FACTOR(S) are as follows:

a.      <u>Defendant lacks criminal history</u>. Although the Defendant does not have any previous convictions, the

Court finds this mitigating factor should be viewed within the light that the evidence (Everhart testimony, Main PC, and Boring Letter) shows that he had committed numerous offenses over the course of many years against the victim herein. Although Defendant is only charged with the commission of crimes occurring between October 2014, and October 2015, the evidence shows thefts over the course of years. While the Court recognizes that the Defendant has no previous criminal convictions, the Court also recognizes that Defendant had been victimizing Laughery Valley for years before October of 2014. Therefore, the Court does not give this mitigating factor much weight.

b.     <u>Defendant shows remorse for the commission of the offense.</u>  Defendant recognizes that his crimes have embarrassed certain persons that had nothing to do with his criminal enterprise. The Court recognizes this as a mitigating factor, but because he's now before the Court for sentencing under the terms of a favorable plea agreement, the Court does not believe this factor to be of substantial weight. Further, it appears that the Defendant is more remorseful for humiliating other persons and himself than he is remorseful for stealing from the victim. Therefore, this is a mitigating factor, but not of substantial weight.

V.  Defendant's guilty plea is not a mitigating factor because he already received a benefit of a Plea Agreement; namely the dismissal of 28 counts. This was a significant benefit to the Defendant.

(App. at 129-30 (emphases in original) (formatting altered).)  The trial court found the aggravators "significantly outweigh" the mitigators, (*id*. at 130), and

imposed a fifteen-year sentence with three years suspended to probation. The court also ordered Linville to "pay restitution to Laughery Valley . . . in the amount of $98,310.30." (*Id.* at 131.)

[6] Linville then filed a motion to correct error that challenged both his sentence and the restitution order. He argued the court "relied on aggravating circumstances that are not supported by the record or are improper as a matter of law." (*Id.* at 138.) As to restitution, Linville asserted the court's ruling was "incorrect as a matter of law. Under Indiana law the restitution order could not have exceeded $35,729.00." (*Id.*) The trial court denied Linville's motion to correct error in a lengthy order that will be quoted where relevant to the issues raised on appeal.

# Discussion and Decision

[7] Linville appeals from the denial of his motion to correct error. We generally review the trial court's grant or denial of a motion to correct error for an abuse of the trial court's discretion. *State v. Johnston*, 65 N.E.3d 1061, 1062 (Ind. Ct. App. 2016). An abuse of discretion has occurred if the trial court's decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *State v. Collier*, 61 N.E.3d 265, 268 (Ind. 2016) (quoting *McElfresh v. State*, 51 N.E.3d 103, 107 (Ind. 2016)). If, however, the issues raised on appeal are pure questions of law, we review those issues *de novo*. *Johnston*, 65 N.E.3d at 1062.

*Sentence Length*

[8]     Linville first argues his fifteen-year sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we] find that the sentence is inappropriate in light of the nature of the offense and the character of the offender." As we conduct our review, we give "substantial deference" to the decision of the trial court. *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied* 135 S. Ct. 978 (2015). "The principal role of appellate review should be to attempt to leaven the outliers . . . but not to achieve some perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

> Ultimately the length of the aggregate sentence and how it is to be served are the issues that matter. In the vast majority of cases, whether these are derived from multiple or single counts, involve maximum or minimum sentence, and are concurrent or consecutive is of far less significance than the aggregate term of years. And whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.

*Id*. at 1224. We "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id*. at 1225.

[9]     Linville was convicted of six Level 6 felonies, each of which carried a potential sentence of six months to two-and-a-half years, with the advisory sentence

being eighteen months. *See* Ind. Code § 35-50-2-7(b). The court imposed two-and-a-half years for each conviction and, pursuant to the plea agreement, ordered those sentences served consecutively. Thus, Linville received the maximum possible aggregate sentence for his convictions, fifteen years.[5]

[10] As to the nature of his crime, Linville notes he "caused only pecuniary loss and not physical damage to the crime victim." (Br. of Appellant at 11.) However, as the trial court noted in its sentencing order, Linville's crimes constituted a "two-prong violation of trust," (App. Vol. 2 at 130), because Linville was the middle man between Laughery Valley and nearly 400 of its customers, so he violated the trust of his employer *and* the trust of the employer's customers. Evidence of this extended impact of Linville's crimes was presented in the victim impact letter presented on behalf of Laughery Valley, which stated:

> . . . Laughery Valley wants the Court to know that the seventeen charged instances of theft/making or delivering a false sales document represents but a fraction of the overall harm Steve Linville has caused to Laughery Valley.
>
> [T]o this day Laughery Valley experiences the lasting effects of Steve's crimes. Not only was Laughery Valley deprived of hundreds of thousands of dollars of potential revenue, but Laughery Valley has expended considerable resources pursuing

---

[5] Linville argues his fifteen-year sentence is inappropriate because it is the same length "as people who have committed much more egregious crimes." (Br. of Appellant at 15.) While the cases Linville cited involved rape, battery of a child, and dragging a police officer behind a car, which are more egregious, they all involved crimes that occurred in a single incident. Linville, by comparison, pled guilty to committing his crimes repeatedly over the course of one full year, such that his comparison to those other cases does not convince us that his sentence is inappropriate for his crimes.

the civil litigation against Steve and the other defendants, with no end in sight. Laughery Valley has also been forced to defend against counterclaims in that suit alleging that Laughery Valley was negligent in hiring, supervising, and retaining Steve as an employee.

In addition, Laughery Valley continues to battle rumors in the community that one of its former delivery drivers stole fuel directly from Laughery Valley's customers. In fact, just this month Laughery Valley received a new claim from a customer who says they believe that Steve stole fuel from them. Laughery Valley has turned that claim over to its insurance carrier.

Steve's crimes have caused ripples of consequences in the lives of everyone involved . . . . While many of those consequences are monetary and can be itemized and accounted for, others are more difficult to quantify. The full extent of reputational harm experienced by Laughery Valley, and the interference with its customer relationship, may never be known, but it will continue to be experienced for months and years to come. In determining Steve Linville's sentence, Laughery Valley hopes the Court will fully consider both the direct, readily-quantifiable harms caused by Steve's actions, as well as those that are more indirect and difficult to calculate, but no less real.

(*Id*. at 128.) Based on the harm caused, and thus the nature of Linville's offense, we cannot say a fifteen-year sentence is inappropriate for his crimes.

[11]    Regarding his character, Linville notes he "expressed genuine remorse and he has no criminal history." (Br. of Appellant at 11.) However, the trial court explicitly found "it appears that the Defendant is more remorseful for humiliating other persons and himself than he is remorseful for stealing from

the victim." (App. Vol. 2 at 130.) Furthermore, while Linville has no criminal history, he spent more than a year stealing repeatedly from his employer, creating false documents to facilitate his commission of theft, and involving his uncle, who owned Bob's Service Station, in his scheme. Thus, we also cannot say a fifteen-year sentence is inappropriate for Linville's character. We accordingly affirm the length of his sentence. *See*, *e.g.*, *Keller v. State*, 987 N.E.2d 1099, 1122 (Ind. Ct. App. 2013) (twenty-nine-year sentence not inappropriate for convictions of repeated acts of burglary and theft, where criminal history included only prior conviction of conversion), *trans. denied*.

### Restitution Order

[12] "As part of a sentence or as a condition of probation, a trial court may order a defendant to pay restitution to a victim." *Morgan v. State*, 49 N.E.3d 1091, 1093 (Ind. Ct. App. 2016). Traditional goals of restitution are to "vindicate the rights of society[,]" *Iltzsch v. State*, 981 N.E.2d 55, 56 (Ind. 2013), and to "impress upon a criminal defendant the magnitude of the loss he has caused and his responsibility to make good that loss as completely as possible." *Kotsopoulos v. State*, 654 N.E.2d 44, 46 (Ind. Ct. App. 1995), *reh'g denied, trans. denied*.

[13] Orders of restitution are within the trial court's discretion, and we will reverse only if the trial court has abused that discretion. *Green v. State*, 811 N.E.2d 874, 877 (Ind. Ct. App. 2004). "An abuse of discretion occurs when the trial court misinterprets or misapplies the law." *Id*. A restitution order must be supported by sufficient evidence. *Rich v. State*, 890 N.E.2d 44, 49 (Ind. Ct. App. 2008), *trans. denied*. "Evidence supporting a restitution order is sufficient if it affords a

reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." *J.H. v. State*, 950 N.E.2d 731, 734 (Ind. Ct. App. 2011).

[14]   Herein, the State charged Linville with thirty-four crimes based on seventeen occurrences of theft, and on those seventeen dates Linville stole a total of $98,310.30 from Laughery Valley.[6] Pursuant to his plea agreement, Linville was convicted of six crimes. The trial court ordered Linville to pay $98,310.30, and Linville argues that was error under *Dull v. State*, 44 N.E.3d 823 (Ind. Ct. App. 2015).

[15]   Dull was indicted for one count of Class D felony theft for an act that occurred in the "summer or fall of 2013." *Id*. at 825. He pled guilty to that crime and agreed the court could determine restitution. A witness from the business testified Dull committed additional thefts and had stolen $145,633.40. At the guilty plea hearing, Dull admitted two other thefts from the same business during the charged timeframe and "agreed to pay restitution for the grain he took . . . on three occasions." *Id*. at 832. Cancelled checks demonstrated that "during the relevant time period in the indictment, there were fourteen transactions . . . that totaled $26,110.98." *Id*. at 828. Dull's counsel argued his

---

[6] Laughery Valley's investigation of Linville's sales and behavior concluded that Linville began stealing from Laughery Valley in 2011 and that, all told, he had stolen around $350,000 in sixty-one acts that occurred over four years. As the trial court noted in its order on Linville's motion to correct error, Indiana law prohibits the trial court from ordering Linville to pay restitution for those additional uncharged amounts. (*See* App. at 145 (citing *Dull v. State*, 44 N.E.3d 823 (Ind. Ct. App. 2015).)

restitution should not be more than $26,110.98. The court ordered Dull to pay $145,633.40.

[16] On appeal, we reversed the trial court's order because the trial court could not order Dull to pay restitution for acts prior to the summer of 2013 when Dull had not pled guilty to committing theft before that summer and had not agreed to pay restitution for acts committed before that time. *Id*. at 832. In the process of so holding, we explained:

> Indiana Code § 35-50-5-3(a), which governs restitution, provides that a "court shall base its restitution order upon a consideration of: (1) property damages of the victim incurred *as a result of the crime*, based on the actual cost of repair (or replacement if repair is inappropriate)." (Emphasis added). The trial court cannot order a defendant to pay restitution for crimes to which he did not plead guilty, has not been convicted, or did not agree to pay as restitution. *See Polen* [*v. State*], 578 N.E.2d [755,] 756-57 [(Ind. Ct. App. 1991)]. *See also Hill v. State*, 25 N.E.3d 1280, 1283 (Ind. Ct. App. 2015) ("Absent an agreement to pay restitution, a defendant may not be ordered to pay restitution for an act that did not result in conviction.").

*Id*. at 831. Because Dull had agreed to pay restitution for the summer and fall of 2013 and, through counsel, had agreed the amount was the total of the fourteen checks written in that time period, the restitution order had to be reduced to $27,778.18. *Id*. at 832-33.

[17] At the sentencing hearing, Linville argued: "*Dull* requires the Court to enter restitution in the amount of Thirty-Five Thousand Seven Hundred Twenty-

Nine Dollars ($35,729.00) . . . for the six counts to which were pled."[7] (Tr. at 61.) However, in pronouncing its order, the trial court said:

> [T]he law states the Trial Court cannot order a Defendant to pay restitution for crimes which he did not plead guilty, has not been convicted or did not agree to pay as restitution. Well, these proceedings got started a little late today because the Court went back and listened to the guilty plea hearing and at the guilty plea hearing, everybody was in agreement that your amount could be readily determined by the informations. There wasn't such an argument. The argument there was between Ninety-Eight Thousand (98,000) and three hundred and forty-four thousand (344,000). So, you were in agreement at the time of the guilty plea that you owed Ninety-Eight Thousand Dollars ($98,000.00) and that is sufficient to find that that should be the amount of restitution that you should have to pay. . . . Specifically, it's Ninety-Eight Three Ten and Thirty Cents ($98,310.30). So, the Court's going to iss . . . enter a restitution order in that amount.

(*Id.* at 70.)

---

[7] On appeal, Linville argues the restitution order should have been only "$17,786.50." (Br. of Appellant at 21.) Appellate counsel notes $17,786.50 is the total for the three thefts, and then she suggests "it is unclear how [trial] counsel arrived at" $35,729.00, suggesting trial counsel may have added improperly. (*Id.* at 21 n.2.) However, on the same page of the Transcript to which appellate counsel cites, trial counsel explained how he reached $35,729.00. (*See* Tr. Vol. 2 at 61 (explaining there were seventeen acts of theft and each charge of making a false sales document had a corresponding theft that occurred on the same day, such that the damages from each false document was that day's theft).) (*See also id.* at 19-20 (discussing that there were seventeen dates on which the two crimes occurred concurrently, resulting in thirty-four charged crimes).)

Linville was convicted of three counts of theft during which he stole a total of $17,786.50 and three counts of making a false sales document, which facilitated his theft of an additional $17,942.50, bringing the damages for his six crimes to a total of $35,729.00. On this basis, trial counsel urged the court to enter a restitution order of $35,729.00, and Linville cannot now assert that amount is error. *See Dull*, 4 N.E.3d at 832-33 (Appellate court ordered Dull to pay restitution for fourteen transactions during summer and fall of 2013, because that was the timeframe in which Dull admitted thefts and, through counsel, Dull had agreed the amount he should be ordered to pay was the total of the fourteen checks written in that time period, even though Dull was only convicted of three counts of theft).

[18]     Linville then filed a motion to correct error challenging the validity of the restitution order that required him to pay $98,310.30.  In response, the trial court entered the following findings and conclusions:

> I.     $98,310.30 in restitution is supported by the law and evidence.
>
> 1)     The Parties entered into a Plea Agreement wherein the parties agreed as follows: "*Defendant shall pay restitution to Laughery Valley Ag.  The restitution amount shall be determined by the Court following a Restitution Hearing.*"  The Plea Agreement was filed on October 23, 2017, and the Guilty Plea Hearing was held on October 24, 2017.
>
> 2)     During the *Guilty Plea Hearing*, the defense stated that the restitution should be approximately $100,000.  At that time, the State said it would be asking for $344,023.45.  The defense contested a letter submitted by the victim who was asking for "*much more restitution than what's charged.*"  (asking for over $360,000)
>
> The *Guilty Plea Hearing* Transcript shows that the restitution dispute was in regards to the defense's position that restitution was approximately $100,000 (the amount "*charged*") versus the State's position that the restitution was $344,023.45.  Probative excerpts from the *Guilty Plea Hearing* include at least the following:
>
> Excerpt 1:
>
> **MR. WATSON:** "*… I note that this letter that's just been delivered to the Court is, I think, indicating much more restitution than what's charged.  I just would make that point.*"

Excerpt 2 (State's Statement and Defense Counsel's Response thereto):

**MR. TUCKER:** "*Your Honor, I know what's alleged in the probable cause affidavit … I know it's $344,023.45.*"

**MR. WATSON:** *But the counts look to me like they don't add up to that ($344,023.45). Maybe I'm wrong… I mean, it looks to me like that the theft counts, seventeen (17) of them add up to, and these are rounded numbers, around a hundred thousand ($100,000).*

Excerpt 3:

**MR. WATSON:** *And then just roughing the seventeen (17) out and, again, this is not an exact number and everybody in this courtroom knows I'm not a mathematician, okay, but it looks to me like those seventeen (17) counts add up to about a hundred grand ($100,000).*

3)      Further, the Transcript of the *Guilty Plea Hearing* shows that the defense may have even agreed to the Court having the discretion to find a higher amount of, or additional, restitution as defense counsel referred to the "various ways" that restitution may be figured, including "loss of sale" and counsel further pondered that there could be a "combination request". The defense certainly made no suggestion that restitution should be, or could be, limited to the $35,729.00 or that restitution was limited to the amounts Defendant pleaded guilty to. The dialogue in the *Guilty Plea Hearing* is absolutely contrary to that assertion.

4)      During the *Sentencing Hearing*, the State and the Defense changed their positions wherein the State backed the victim's request for over $360,000 and the Defense responded by requesting restitution of $35,729.00.

5)      Based upon Dull v. State, 44 N.E.[3]d 823 (Ind. App.2015), the Court found that the Court was limited to $98,310.30, which was the amount "*charged*" and the amount that the defense was advocating for during the *Guilty Plea Hearing*. Defendant had been agreeable to, or acquiesced in, restitution for the amount "*charged*", but certainly contested the larger figures.

6)      The Court also finds that the Probable Cause shows that the Defendant admitting to stealing at least $82,000. "*STEVE LINVILLE further told MIKE BORING that he deposited $82,000 from the thefts into his and his wife's bank account … from the stolen fuel, oil, washer fluid, and antifreeze … that belonged to LAUGHERY VALLEY AG*". Defendant's admission in the Probable Cause is consistent with the defense's *Guilty Plea Hearing* position.

7)      Dull allows restitution to be determined in an amount beyond the offense(s) to which a Defendant pleaded guilty to, if the Defendant so agrees. Further, Kinkead v. State, supports a finding of restitution based upon statements made by the Defense. 791 N.E.2d 243 (Ind. App. 2003) (holding that the Defendant was appropriately ordered to pay restitution in a higher amount when he stated he would pay "*whatever the Judge decides my restitution should be is what I, what I will . . . be willing to pay*". Here, during the *Guilty Plea Hearing* the Defense made several statements that restitution should be the amount "*charged*" in the 17 counts (approximately $100,000), not $344,023.45 or $360,000.

8)      The record shows that the Defendant was correct during the *Guilty Plea Hearing* that appropriate restitution is $98,310.30 and Dull prevented an award for $340,000 or more. The Court's decision, now alleged to be error, actually provided a substantial benefit to Defendant.

Where there is a Plea Agreement dismissing numerous counts and for a restitution hearing, and where, during the *Guilty Plea Hearing*, the defense made clear statements evidencing the Defendant's position that restitution was the approximately $100,000 "*charged*", and where the Court found that <u>Dull</u> significantly limits the Defendant's restitution and the evidence, even by the Defendant['s] own omission [sic], supports the amount of restitution awarded herein, the Court finds that the restitution award was the legally appropriate amount after considering the law and evidence.

**WHEREFORE**, the Court **DENIES** the *Motion to Correct Errors* as to restitution.

(App. Vol. 2 at 144-45 (emphases and errors in original).)

[19]     Our review of the transcript of the Guilty Plea Hearing leads us to a very different conclusion. At that hearing, defense counsel was discussing his need for further discovery to determine whether additional documentation existed to support an order of restitution greater than the amount charged as to each offense:

> I can tell the Court that one of [the] things I'm going to do in a response, it might just be there's nothing new, but I probably will ask for an order for additional discovery to indicate any, you know, documentation that, if the State believes there's any documentation for restitution that's not already been discovered or sent to us that's out there or anything that's new that's come into them, um, so I'll probably be asking for that.

* * * * *

But the counts look to me like they don't add up to [the $344,023.45 alleged in the probable cause affidavit]. Maybe I'm wrong. In any event, it is what it is. I'm just . . . That's my whole point. The restitution issue is . . . an issue in terms of trying to come down to an exact number or the various ways that restitution might be collected. For instance, um, it's noted in the letter that, you know, there's, there's the actual dollar amounts that are alleged because of checks that were written, but then there's the question of loss of sale in terms of, well, their allegation is that, you know, the, the gas being sold at a value lower than the, you know, than the market value. So, I'm not clear if there's going to be a combination request based on that or if that maybe makes up a difference that I'm not seeing. I mean, it looks to me like that the theft counts, seventeen (17) of them add up to, and these are rounded numbers, around a hundred thousand (100,000). . . .

* * * * *

. . . I just want to be clear before I come to the hearing, exactly what are the streams of restitution that Laughery is asking for. Is it just flat out the transaction that occurred on these individual dates? Are they also asking for loss related to the gas they could have sold at a higher price and how do we propose to prove that? That's, that's what some of the technicalities are here.

* * * * *

. . . it looks to me like those seventeen (17) counts add up to about a hundred grand (100,000). Each one of those counts states a specific amount and the low amount running somewhere around Forty-Three Hundred Dollars ($4,300.00) and the high amount running as high as eighty-three (83), but most of them ranging between five and six or five and seven, I should say, and I just went through them again just to . . . So, you see, Judge,

what I'm saying is there's, there's a lot of numbers here. The Proba . . .[sic] the PC Affidavit says one thing. I know what's going on in the civil litigation, because I'm in it. There's, in the letter they seem to be alleging there's a different stream of restitution, which may be logical and reasonable and that might be that we intend to prove what the gas price was on each one of these days and what the difference was, we could have sold it for that too, and that our only loss is not the number here but it's more because the gas itself was worth much more than what was taken. I'm not sure. That's why I want to send a little discovery to make sure I know what the State intends to present, um-

(Tr. Vol. 2 at 14-21.)

[20]    When considered within the context of his full arguments at the guilty plea hearing, we cannot agree Linville's counsel agreed that his client was responsible for the nearly $100,000 alleged in support of the seventeen counts of theft. Rather, counsel was explaining that he needed additional discovery to understand why the probable cause affidavit indicated Linville had stolen $344,023.45 and the newly submitted letter indicated Linville had stolen more than $360,000, but the amounts listed in the criminal charges amounted to only approximately $100,000.00. He explained that, to represent Linville's interests at the sentencing hearing, he needed to understand how the State intended to demonstrate the amounts of restitution it would be requesting, if that amount would be greater than the amounts alleged in the charging affidavits, which were supported by the checks that Linville received from Bob's Service Station. At no point did counsel agree that Linville should be or would be responsible for the money alleged to have been stolen during all seventeen thefts. "The trial

court cannot order a defendant to pay restitution for crimes to which he did not plead guilty, has not been convicted, or did not agree to pay as restitution." *Dull*, 44 N.E.3d 831. We therefore hold the trial court's denial of Linville's motion to correct error as to restitution was an abuse of discretion. *See Wright v. Wright*, 782 N.E.2d 363, 368 (Ind. Ct. App. 2002) (denial of father's motion to correct error was abuse of discretion where evidence before trial court did not support denial).

[21] Because Linville did not agree to pay restitution for all seventeen thefts that were charged, he could not be ordered to pay $98,310.30 in restitution when he was convicted of only six crimes. *See Dull*, 44 N.E.3d at 832 (court abused its discretion by ordering Dull to pay for more checks than those written during the timeframe he agreed to pay). Linville's counsel did concede the restitution order for those six crimes should be $35,729.00, based on the amounts of the checks written by Bob's Service Station to Linville on those dates. (*See* Tr. Vol. 2 at 61.) At the restitution hearing, the witness for Laughery Valley testified the restitution it was requesting was based only on sixty-one checks written to Linville from Bob's Service Station. (*Id.* at 40-41.) As such, Laughery Valley was not requesting reimbursement in this criminal context for any other form of loss caused by Linville's actions. We therefore can determine that the trial court should have ordered Linville to pay $35,729.00 in restitution. We accordingly reverse the trial court's order as to restitution and remand for the trial court to modify the judgment against Linville to indicate he must pay $35,729.00 in restitution to Laughery Valley.

# Conclusion

[22] In light of Linville's character and offense, we see nothing inappropriate about his fifteen-year sentence, three of which were suspended to probation, and we affirm the length of his sentence. However, the trial court abused its discretion when it ordered Linville to pay $98,310.30 in restitution. We therefore reverse and remand for the trial court to enter a new order requiring Linville to pay $35,729.00 in restitution to Laughery Valley.

[23] Affirmed in part, reversed and remanded in part.

Baker, J., and Robb, J., concur.